Johnson, Justice,
 

 delivered the opinion of the court. — This is a writ of error from the circuit court of Pennsylvania, on a judgment, in which the defendants in this court were plaintiffs in the inferior court. The suit instituted in that court, was for the recovery of a sum of money paid under the following circumstances :
 

 The Grades, being owners of the ship America, chartered her to one Chambers, on a voyage to India. Chambers accompanied the vessel, and, at Calcutta, put her up as a general ship, with notice, however, of his being charterer, not owner. Finding it difficult there to obtain freight, he entered into an arrangement with Palmer, in pursuance of which, the latter supplied him with a quantity of goods, to the value of 8000¿. upon the following stipulations :
 
 “
 
 That Chambers should draw bills in favor of Palmer
 
 &
 
 Co., «pon his correspondent in Philadelphia, and that the goods should be consigned to the Wiliings, correspondents of Palmer, in the same place; to whom they should be delivered, freight free, in pledge for the due payment ©f Chambers’s bills.”
 

 When the goods were laden on board the America, *the ship-master signed bills of lading, stating them to be shipped on account and risk of Chambers, to be delivered to the Messrs. Wiliings, of Philadelphia. And in that part of the bill of lading, in which the freight is usually specified, are inserted these words, “ freight for the said goods having been settled here.” Indorsed on the bill of lading are the marks and numbers of the several packages, and on its face are written these words, “ marks and numbers on the back of this bill, countersigned, Hugh Chambers.” This is the indorsement noticed in the stated case. A charter-party, with all the usual covenants and formalities, was entered into by the parties, in which the owner undertakes to furnish and navigate the ship, and the charterer to pay the sum of $32,000 for the use of her, with certain specific reservations, not material to the decision of any of the questions raised in argument. The clause which stipulates for the payment of the compensation is in these words, “ the said charterer covenants,” &c.,
 
 “
 
 that he will pay to the owner's,
 
 *279
 
 on the return of the said ship to Philadelphia, and before the discharge of her cargo there, in approved notes,” &c., the sum stipulated for.
 

 The case stated affirms, that the whole transaction in Calcutta was effected in good faith ; that it was done with the knowledge and assent of the ship-master, and was, under all circumstances, “ the best he could do for the interest of the owners of the ship.” The bill of lading was inclosed to the Willings, *with information of the arrangement between Palmer and Chambers-; and the drawees of Chambers’s bills having refused to accept them, the Willings demanded the delivery of the goods, freight free. The Gracies refused to deliver the goods, insisting on their right to the freight usually paid on such goods from India, whether they were the property of Palmer or of Chambers. And in order to get possession of the goods, the freight'was accordingly advanced by the Willings, and this action brought to recover it back. The cause was decided in the court below upon a case stated, in nature of a special verdict, which finds alternatively for the one or the other party, according to the law of the case. The judgment of the circuit court was in favor of the defendants.
 

 Much of the argument below appears to have turned upon the general rights and liabilities of owner and charterer, under the contract of affreightment ; but the learned and elaborate argument of the presiding judge in the court below, has relieved this court from much discussion on that part of the subject. The doctrine, as laid down there, and as stated by the counsel here, exhibits no material shades of distinction. It is, in fact, the common-law doctrine of bailment, and common carriers, applied to transportation on the ocean. The carrier may hire his vehicle, or his team, or his servant, for the purposes of transportation ; or he may undertake to employ them himself in the act of transporting the goods of another. It is *in the latter case only, that he assumes the habilites, and acquires the rights of a common carrier. So, the ship-owner, who lets his ship to hire to another, whether manned and equipped or not, enters into a contract totally distinct from that of him who engages to employ her himself in the transportation of the goods of another. In the former case, he parts with the possession to another, and that other becomes the carrier; in the latter, he retains the possession of the ship, although the hold may be the property of the charterer ; and being subject to the liabilities, he retains the rights incident to the character of a common carrier.
 

 On examining the cases in which this subject has engaged the attention of courts of justice, it will be found, that the great difficulty generally has been, to decide in which of these two relations the ship-owner had placed himself, under the particular stipulations of the charter-party ; and how far he has put it in the power of the charterer, to defeat his acknowledged right to a lien for the freight. The present case suggests the additional question, how far it lies in the power of the ship-master, to defeat this lien, or otherwise sanction a departure from the letter of the charter-party. The cause has been argued as one vitally important to the commercial world ; and very strong views have been presented of the injuries that might be sustained by foreign shippers, on the one hand, and by ship-owners, on the other, as the one or the other alternative of the stated case *shall obtain the sanetion of this court. But it is obvious, that most, if not all of these
 
 *280
 
 suggestions, have been the offspring of a zealous, rather than a calm, survey of possible consequences.
 

 The contract of affreightment, like every other contract, is the creature of the will of the contracting parties. It may be varied to infinity, and easily adapted to the exigencies of either party, or of any trade. It is only where the express contract is silent, that the implied contract can arise. It is possible, that a master and a charterer might connive at a fraud, and pass a chartered vessel upon foreigners as an unchartered vessel; but it is not very probable, and would be extremely difficult. Yet it is not easy to conceive any other case, in which a foreign affreighter can be exposed to imposition, while it is always in his power to inspect the charter-party, and determine, from its stipulations, how far he may venture to ship his goods upon a special contract. The general liability of goods for freight, is known to all mercantile men ; and a stipulation in a charter-party, “ that no goods shall be landed from the vessel, until the freight is paid,” will always alarm the fears of any prudent shipper.
 

 But this case does not imperiously call for a decision upon the general question. The goods are expressly laden on board, as the property of Chambers, “on his account and risk.” And the question is not, how far his contract may exempt the goods of another from freight, but how far he may incumber his own goods with a lien, which *sball ride over or supersede their general liability for the freight. We turn, in the first place, to the express contract of the parties, to afford a solution of the question. But there we find that the charterer cannot, without an express violation of his contract, deliver to the consignee a single article, not only until its own peculiar freight be paid, but until the payment of the sum of $32,000, the whole of the freight reserved to the owner.
 

 On what principles rests the general lien of goods for freight? The master is the agent of the ship-owner, to receive and transport; the goods are improved in value, by the cost and cares of transportation. As the bailee of the shipper, the goods are in the custody and possession of the master and ship-owner, and the law will not suffer that possession to be violated, until the laborer has received his hire. But this is literally the effect of that provision in the charter-party, which deprives the charterer of the right of landing the cargo, until the stipulated hire be paid; or rather, it would seem to go beyond it, and impose a liability beyond what the common law exacts. It may, therefore, be fairly construed into a stipulation, that the charterer should, under no circumstances, dispense with the legal lien of the ship-owner.
 

 The question, then, is, who has trusted this charterer ? for he that trusts must pay. That the ship-owner would not confide in the charterer to land his goods, without buying off his right to detain, is expressly proved by the contract. *That contract was accessible to the foreign shipper, and ought to have been looked into, to determine the extent of the power vested in the charterer. Whether he neglected this precaution, or contracted with the charterer, knowing of this restriction on his power to contract, he is the party that trusts. The charterer has contracted with the shipper to do an act, which he could not perform, without violating his own contract to the ship-owner, and must, therefore, be considered as having entered into a contract, subordinate in its nature to that previously existing
 
 *281
 
 between the owner and charterer. And as the undertaking of the charterer to Palmer, could only be performed, upon first complying with his undertakings to the owner, he must be considered as having rested on the personal responsibility of the charterer, for the removal of that obstacle.
 

 That, in ordinary cases of the hypothecation of goods, the lien for freight would take precedence, cannot be questioned ; and in a late adjudication, on a case strikingly similar to the present, and in the courts of a nation which thoroughly understands the laws and interests of commerce
 
 (Faith
 
 v.
 
 East India
 
 Company, 4 B. & Ald. 630), it has been held, that goods so circumstanced, were bound to the whole extent of the liability of the charterer to the ship-owner for freight. In the present instance, a
 
 pro rata
 
 freight only is demanded. In the same case, it was further decided, that the ship-owner retained his lien for freight, on goods shipped by third *persons, even after the drawing of freight-bills, in favor of another, by previous agreement.
 

 But it is contended, that the case where goods are shipped freight free, or the freight has been actually paid, remains undecided ; that the lien for freight attaches only where freight was actually due, but in neither of those cases (that of payment or redemption),.could it be predicated of freight, that it was due. Had the reasoning of the judges, in the case of
 
 Faith
 
 v.
 
 East India
 
 Company, been followed out to its unavoidable consequences, it would seem, that no doubt should have been expressed by them upon such a case. For, if the ground of that decision was, that the ship-owner was not bound to deliver the goods, until his freight was paid, it would seem to be immaterial, whether it had been previously paid to the charterer, or to any other, not authorized to receive it on account of the owner. But whatever might be the opinion of this court upon a cause so circumstanced, it i» obvious, that this is not a case of that nature.
 

 These goods were not shipped freight free, nor was the freight actually paid upon them. The words npon the bill of lading are,
 
 “
 
 freight settled here.” And their ambiguity being explained by other parts of the case stated, there is made out a case, in which the freight was no further settled than by the arrangements made with Palmer, for the purpose of postponing the freight to the defendant’s lien for advances of money, or the payment of bills. The compensation for carriage, *although disguised under the form of. possible profits upon the sales of the goods shipped, still existed ; for freight is one of the charges which the consumer pays. It is, then, only an evasion of the rights of the owner, and presents a facility to evasion, which ought not to be encouraged. If it be said, that the payment of freight was, nevertheless, contingent and uncertain, the reply still is, that this is a subject for consideration between the charterer and the shipper, and could not be sanctioned, as the means of evading the express provision in the charter-party, against the right of delivery before the payment of freight. Although no freight had been due to the charterer, there was unquestionably a large sum due the owner; and by the terms of his agreement, literally construed, he was not bound to open the hatches, until the whole sum was paid. This, however, is more than is contended for upon the plaintiffs’ construction of the contract ; and more, unquestionably, than would have been sustained as against other shippers; it is not, in this instance, insisted upon, as against the charterer himself. But, in fact, this
 
 *282
 
 memorandum of the master on the subject of freight, is altogether an immaterial circumstance, in a bill of lading made to the charterer himself. . With whom was he at liberty to settle the freight upon his own shipments, to the prejudice of the ship-owner?
 

 And this leads to the consideration of the last point made in argument for the defendants to wit, that the acts of the master bound the ship-owner to a compliance with the stipulations made to the *defendants, Palmer & Co., to the prejudice of the lien insisted on by the present plaintiffs. That is, that either the master alone, or the master and charterer together, could divest the owner, both of his implied and express right to detain these goods. Whence is such a power to be deduced ? Not from the charterer’s rights in the ship, nor from the master’s power over the ship; but it is supposed to result from the necessity of the case, the nature of the interest acquired by the charterer, and the general powers of a ship-master, as incident to the duties which he is called upon to perform.
 

 But it is perfectly clear, that it is not in the power of the master to release the charterer from his contract to the owner. It is only when the contract is at an end by misfortune, or by the acts of the charterer, that he is called to the exercise of that latitude of power over the ship, which may lead to a resumption of the right to lade her for the benefit of all concerned. In the meantime, he has no power to modify the contract entered into with his owner; since all the power delegated to him, while the charter-party continues to operate, is to perform the undertakings of his employer in the fulfilment of the contract. When abandoned by his charterer, he is of necessity east upon himself, to do the best he can for all concerned ; and whether that be to return empty, or to take in such freight as may offer, he is still acting under his original relations with his owner; for, if not actually carrying into effect the ^stipulations of the charter-party, his general duty is to do nothing that can release the charterer from his liability under it. This is altogether inconsistent with the idea of his being authorized to modify or dispense with the terms of the charter-party.
 

 So far as the interests of the charterer may be affected by the want of power to modify contracts for freight, in any manner that exigencies may require, it has been before observed, that this should have been attended to, in making his contract with the owner. And as it is very certain, that a release from the ordinary security of the carrier, must have been purchased by an enhanced price, or personal security ; so, it would be highly unjust, to subject the owners to a loss of their ordinary security, without compensation in price, or extraordinary security as the substitute. As to the interests of ship-owners themselves, it is enough, for the present case, to say, “let them judge for themselves.”
 

 But there is very great reason to think, that the acts of the master, in this ease, have had views and effects attributed to them, directly the reverse of his intention and understanding in performing those acts. It is observed by one of the judges, in the decision before alluded to,
 
 “
 
 that had the captain done his duty, he never would have taken goods on board, on which the owner would have no lien.” It is right, that a construction should be given to the con-the master, which may comport both with a knowledge, and a due observance of his duty. And in this view of the case, *notwith
 
 *283
 
 standing Ms privity to the arrangement between the charterer and shipper, as he was himself called npon to do no act, that could deprive his owner of his lien, he might well have considered the stipulation between the charterer and shipper as a matter
 
 inter alios;
 
 in pursuance of which, his employer could sustain no loss, however the charterer might render himself liable to ¿he shipper for consequences. Such was certainly not the understanding of the shipper, as to the effect of his contract with the charterer, but he might nave been better informed, by studying the charter-party; and,
 
 non constat,
 
 if the master had been required to sign a bill of lading to the shipper, with an explicit stipulation, that the goods should be free from liability to his owner, that he would have been betrayed into such a breach of duty, or assumption of power. He might well have supposed, that in signing this bill of lading to Chambers, and not to Palmer, he was doing no act that could impair the rights and interests of his employer.
 

 We are, therefore, of opinion, that there is error in the judgment of the circuit court; that it must be reversed, and a mandate issue to enter judgment for the defendants below, agreeable to the case stated.
 

 Judgment reversed.