## The Lloyd.[1]

*(District Court, S. D. Georgia.    June 9, 1884.)*

CONTRACT OF AFFREIGHTMENT.

. Where a vessel is chartered for a lump sum, and rechartered to carry lumber at a rate per thousand, it is for the original charterer to see that she is provided with such lengths and sizes as will give a full cargo; and if her master receives and stows in good faith what is furnished by the merchant under the sub-charter, and it is of such sizes that there is not as much loaded as would be of different kinds, no action lies against the vessel. Amount of lumber carried per ton depends upon class and length of same, and build of vessel. The burden of proof is upon him who alleges fraud in receiving and stowing a cargo.

/

In Admiralty.    Libel *in rem.*

*Garrard & Meldrim,* for libelant.

*Chisholm & Erwin,* for respondents.

LOCKE, J.    The libelant chartered this vessel for a lump sum to load a cargo at Savannah for some European port, "the stevedore at Savannah to be appointed by charterer, at ship's expense;" and rechartered her to load with lumber for Cadiz; rates under second charter to be by the thousand, "not exceeding two hundred and eighty thousand, all under deck." She came to Savannah, and her agent, Peterson, reported her arrival, and that she would soon be ready to take in cargo, and offered his services to represent charterer's interests, and in reply was requested: "Engage a *competent* and good stevedore, who understands his work, as from the charter-party you will notice that the vessel has to employ charterer's stevedore." In accordance with this request Peterson gave notice to the shippers, who had rechartered and were to furnish cargo, of her readiness, and employed a firm of stevedores to load, which they proceeded to do with the lumber as furnished. The original charterer and libelant herein arrived from New York as the loading was being completed, and found that instead of having stowed 307,000 feet under deck and 20,000 feet on deck, as he alleges she should have taken, she had received but 240,532 below deck, and the master refused to take any on deck, whereupon he filed this libel for damage in loss of freight on the difference between what she had on board and what is alleged she should have taken, at the rate of $17 per thousand for that under deck and two-thirds that rate for a deck-load.

Two questions are therefore presented,—one of fact, and one of law,—namely, was the vessel loaded with a full and complete cargo? and, if not, who is responsible for such shortage—the charterer or the owner? The only evidence introduced by libelant to sustain the allegations of the libel in regard to what would be a full and complete cargo for the vessel, is that of several stevedores and shippers of lumber as to the amounts per ton generally carried from this port. They

[1] Reported by W. B. Hill, Esq., of the Macon bar.

generally agree that the amount depends in a great degree upon the character and sizes of the lumber in comparison with the build of the vessel. Both the master and stevedore testify directly that, considering this, the vessel was loaded with as much as could be put into her, and the only question to be decided is whether the fact that this vessel had on board only some 529 feet of lumber per ton of measurement, when vessels average 650 feet or more, is sufficiently accounted for by the size and character of the cargo and shape of the vessel, to overcome the presumption of fraud arising from such fact. The first presumption is of innocence, and reasonable and honest compliance with the terms of the charter-party in taking in a full and complete cargo; but when the cargo is shown to have been so much less per ton than is usual, that presumption is overcome, and a new one arises. In regard to the character of the cargo, the first item of evidence appears in letter from Peterson to Baitzer, the libelant, before the loading commenced, in which he mentions there being no small stowage in the cargo. This, of course, is not evidence to establish this; but the fact that this language was used at this time in connection with his having been selected to employ a stevedore, may, I think, be considered with other testimony upon the same point. The specification shows but about 15,000 feet under 25 feet long, and but 135 pieces under 20 feet, while the greater portion of the cargo is long and large. Bergman, the stevedore, says the lumber was large, with a very small quantity of small sizes; the rest of it was very bad for stowing such a ship. He says: "The cargo was not suitable for the vessel. With small stowage she could have taken some more lumber, but I could not put in any more of the stuff furnished." He also says: "The cargo was stowed as well as it could be stowed, considering the lengths furnished." Small stowage is usually so stated. It is under 20 feet in length, and a vessel requires from 5 to 10 per cent. of the entire cargo to be made up of this class. In this cargo it appears that out of 240,000 feet there was but 6,669 feet of what is known as small stowage, and of this only a portion—135 pieces—was under 20 feet in length, while nearly a third was made up of large, square timber, running from 12 to 18 inches square, only one stick of which was but 30 feet long, and but five under 40 feet, and from that up to over 60. Mr. Salas, the merchant who furnished the cargo, says there was no small stowage, and he told Peterson so; but afterwards, upon the request of the master or stevedore, he ordered 10,000. He says: "The stevedores did worry me so much about small stowage that I ordered Mr. Stillwell to let them have ten thousand." But of this Mr. Stillwell says but 6,669 feet was furnished. Holland, the inspector, thinks there was necessity for more small stowage, as he saw three or four beams left unfilled. It appears that all the small stowage that was furnished was used. The master says he went for small stowage to Mr. Holland three times before he got the 5,000 feet, until he told them that he didn't care whether they let him have it or not. He

says: "I asked for it repeatedly." This agrees with what Mr. Salas says about the stevedores worrying him until he ordered 10,000 feet. I am satisfied that both the master and stevedore made all reasonable exertions to obtain such small stowage as was required.

The stevedores and merchants who have testified in regard to the amount that should be carried, all agree that it depends upon the specifications and adaptability of the lengths to the class of vessel. There was, as has been shown, comparatively little short or small stuff in the cargo. The vessel appears to have been sharp, or, as one said, "sharp full." The master says she was sharp—sharper than usual—in the lower hold, fore and aft. She had no between-deck, but between-deck timbers, mid-way between the deck and floor, about 12 inches square. The depth of hold was but about 14 feet. In the widest part of the vessel the width outside was but 29 feet, and inside she must have been considerably less. It will therefore appear that, in order to stow such a vessel to advantage, there must have been fully one-tenth, if not one-eighth, of it under 28 feet, and much of it under 25, and so on down in shorter lengths, even to have filled the places between the beams, where the lumber could not have been stowed fore and aft. But the specifications filed in evidence show that of the entire cargo but about 16,000 feet was in pieces under 28 feet in length. This is as to the beam-filling alone, and in a sharp vessel much lumber of comparatively short lengths is required in the bows and run for advantageous stowage.

I am satisfied, from a careful consideration of the question, that the cargo was not adapted to the vessel; but let us examine whether or not the difference between what was laden on her, and what should have been put on board, can be accounted for. All the witnesses seem to agree that about 650 feet to the ton is an average cargo, where the specifications of the cargo are adapted to the vessel, but they do not all agree whether or not that should include the deck-load. Salas says vessels will carry from 650 to 700 feet to the ton, including small stowage and deck-load. Butler, a stevedore, thinks vessels will carry from 650 to 700 under deck, while Roberts thinks 700 feet per ton is a fair average, and he never knew of vessels going without a deck-load. This deck-load may be from 20 to 33⅓ per cent. of that under deck. This would leave from 525 to 585 feet per ton under deck.

It is not disputed by the libelant, as I understand, that there was not a sufficient amount of small stowage to make her stow to advantage, but it is claimed that it was the master's fault that this was not procured, in order that the vessel might be filled in measurement, regardless of what the cargo was as long as it was lumber, and that he should have refused to go on loading, even until he could have obtained pieces to fill the entire room of the vessel, before it could be understood that he had taken a full and complete cargo. With this view of the case I cannot agree. The vessel had been rechartered by libelant to one La Tassa, who had ordered from merchants in Sa-

vannah a cargo of lumber of certain sizes and lengths by specifications. She was chartered to take this lumber and none other, and the only right the master had was to demand such small stowage as would make the cargo stow safely, so as not to endanger the ship. If the cargo provided was not such as to give suitable stowage, so as to make a "full and complete cargo" according to measurement, the right of action, if at all, is against the sub-charterer and not against the ship.

The reason why the vessels referred to have averaged so much more per ton than the Lloyd took in, is, I consider, fully explained by the facts—*First*, that each vessel was selected by the specification for a particular cargo, and adapted to it; and, *secondly*, that the ship has had a special interest in getting such a cargo as would give her the greatest measurement, or the charterer, where the charter has been for a lump sum, has had an active agent present to look after his interests; and also the fact, as I think, plainly appears that this vessel was not adapted to carrying a lumber cargo unless it contained quite a large proportion of short lengths. These reasons, I think, justify the presumption of honesty and reasonable diligence on the part of the master, which has not been overcome by any evidence on behalf of the libelant.

The charter under which the vessel loaded specifies a full and complete cargo, "all under deck." The libelant is therefore estopped from claiming damage for the master's refusing a deck-load, even if the vessel could have carried it safely, of which the evidence, though, raises a doubt.

This conclusion renders unnecessary a consideration of the question as to whether or not the stevedore was agent of the ship or charterers.

The libel will be dismissed, with costs.

---

## THE GRID.[1]

(*District Court, S. D. Georgia.* May 1, 1884.)

SALVAGE—PILOTS ACTING AS SALVORS.
> The service rendered by pilots must be beyond their ordinary duties as pilots to entitle them to salvage; but where there is unusual and extraordinary risk incurred in rendering service to a vessel in distress, although it be but a pilotage service, courts of admiralty may give an additional compensation to encourage meritorious action in such cases.

In Admiralty.
*Robert Falligant*, for libelant.

* Reported by W. B. Hill, Esq., of the Macon bar.