## HART and others *v.* LEACH and others.

(*District Court, D. Maryland.* July 5, 1884.)

SHIPPING—CHARTER-PARTY—BILL OF LADING—EMBEZZLEMENT BY MASTER—
FRUIT CARGO—GOLD COIN—USAGE OF TRADE.

> A vessel was specially chartered for a lump sum to make a voyage from Baltimore to the Bahama islands, the charterers to furnish "ballast out and a cargo of fruit back." A sum in gold coin was given by charterers to the master, for which he gave a bill of lading, "freight as per charter-party." On the voyage out the master left the ship, having embezzled the money. *Held,* that under the charter-party the owners did not contract for the safe carriage of gold coin, and that the bill of lading was given without authority. *Held, further,* that the alleged usage in the fruit trade with the Bahamas to send out in the vessel gold coin with which to purchase the return cargo was not proved to be such a usage as would bind a specially chartered vessel as carrier of the gold, and that in this case the master received the gold as bailee of the charterers.

In Admiralty.

*Barton & Wilmer,* for libelants.

*John H. Handy,* for respondents.

MORRIS, J. The libelants are importers of fruit in the city of Baltimore, and chartered from the respondents the schooner B. A. Wagner, of about 50 tons, for a voyage to the Bahama islands and back. The schooner had just made several such trips in the same employment under a charter between the same parties. The present charter was dated June 14, 1883, and by it the respondents (the owners) chartered the vessel to the libelants for a voyage from Baltimore to one or more ports in the Bahama islands, and back to Baltimore, "the vessel to be tight, etc., and receive on board the merchandise hereinafter mentioned," and the charterers engaged to provide and furnish to the vessel "ballast outward, and a cargo of fruit back to Baltimore," and agreed to pay a lump sum of $500 for the round voyage on a proper delivery of cargo at Baltimore. The agent of the owners, (who was also part owner of the schooner,) as well as the charterers, lived in Baltimore. When the vessel was first chartered, on April 12, 1883, there was some discussion between them about the appointment of a proper master familiar with the fruit trade and the ports to be visited, and upon the recommendation of the charterers the owners appointed a certain McCahan to be master. He was a mariner of experience in this particular fruit trade with the Bahamas, and a man of good reputation, and frequently employed by the charterers. He made the earlier voyages of the season satisfactorily, but on the voyage in question the charterers intrusted to him in Baltimore a bag containing $1,200 in gold coin, to be delivered to their agent at the Island of Eluthera, to purchase pine-apples for the return cargo, and when the vessel had proceeded down the bay as far as Fortress Monroe he went ashore, taking the gold, and has not been heard of since. When the gold coin was given to the master, he executed a bill of lading in usual form, undertaking to deliver the

gold to "J. W. Culmer, Tarpan Bay, Eluthera; freight as per charter-party."

This is a libel against the owners of the schooner to hold them for the non-delivery of the gold. The respondents deny their liability, alleging that the bill of lading was given without their knowledge or authority, and that the only contract binding upon them is the charter-party, and that by its terms they did not undertake the carriage of gold coin. The libelants, however, contend that the charter-party is the usual one by which vessels are hired for the pine-apple fruit trade between Baltimore and other ports of the United States and the Bahama islands,.and that it is well known that it is impossible to use drafts or letters of credit in those islands, and that there is a general usage in that trade by which, under such a charter, unless the vessel takes out merchandise for that purpose, she takes out gold coin with which to purchase the cargo of pine-apples which she is to bring back, and that under this usage the hire agreed to be paid for the vessel for the round trip includes the transportation of gold, if gold is sent out.

It must be conceded, I think, that, as this was not a general, but a specially chartered vessel, the giving of the bill of lading does not alter the rights of the parties to this cause. The bill of lading is an acknowledgment of what is otherwise fully proved in this case, viz., that the gold was delivered to the master, and was taken on board by him; but, as between owner and charterer, it does not vary the contract created by the charter-party. If, therefore, by the terms of the charter-party itself, or by its terms, as explained by any proved and admissible usage, the charterers had the right to send out the gold at the risk of the vessel, then the owners are liable, but not because the master gave the bill of lading contracting for its safe carriage. The master has authority to do all things necessary for the performance of the charter-party, but he cannot vary the contract which the owner has made. *Gracie* v. *Palmer*, 8 Wheat. 639; Abb. (12th Ed.) 89; 1 Pars. Shipp. & Adm. 286. A fair test of the authority of the master to contract for the transportation of the gold under the charter-party is to consider whether, if the owners had refused to give such a bill of lading, the libelants would have had an action for the breach of the charter-party. The language of the charter-party is that the vessel shall receive on board the merchandise hereinafter mentioned, "ballast outward, and a cargo of fruit back to Baltimore." It is said that, by the usage of this trade, under such a charter, merchandise is constantly sent out instead of ballast. Such may be the usage and the understanding, for the merchandise furnishes the weight to stiffen the ship, and is, in one sense, ballast, at the same time that it is cargo, and the stipulation that the charterer shall furnish ballast is inserted for the protection of the owners. But how can the language be extended so as to apply to a bag of gold coin, which is neither merchandise nor ballast, any more than bank-notes would be? It seems to

me, therefore, unless the charter is controlled by usage, the sufficient answer of the owners to such an action would be that they had not refused anything which, by the charter-party, they were required to do.

Let us consider, then, what is proved in respect to the alleged usage. It is shown to be a fact well known to all the parties to this charter-party that the cargo for which this vessel was to go out could only be purchased with money or merchandise, and that vessels in that trade must take out either one or the other. But when money is sent I do not think it is shown that there is any settled course of business. The regular importation of pine-apples from these islands is confined to the libelants and one other firm in the city of Baltimore. It is shown that the vessels are uniformly chartered at a lump sum for a round trip, but it appears that sometimes the charterer sends a supercargo. Sometimes, in addition to the master, a man of special experience is sent, who acts as navigator, and is paid by the owner, but who also acts as supercargo for the charterer. In these cases the person who is supercargo is intrusted with the money. As a rule, when there has been no navigator or supercargo, and the money has been intrusted to the master, no bill of lading has been taken, but a simple receipt from him. In the two voyages made by this same master in this vessel for the same parties in April and May, just preceding the present voyage, no bill of lading was taken. It would seem that taking a bill of lading was the exceptional and not the usual course. It appears that, for this trade, if there is no supercargo, there is required a master, who, from experience, understands the care of a cargo of fruit, and is something of a judge of it, and is able to see to the charterer's interest in dealing with the agents who are to procure the cargoes. He is therefore either selected upon the recommendation of the charterers, or is a man already favorably known to them, and when the vessel is about to sail, if money is sent it is handed to him, together with his letters of instructions. The vessels hired for this trade are not regularly engaged in it, but are usually vessels whose regular employment is to carry oysters on the Chesapeake during the colder months, and which make an occasional voyage for fruit when, during the spring and summer months, they cannot pursue their regular business.

It does not appear to me to be established by the proof that there is a usage for money to be taken out by the master at the risk of the ship, or that a bill of lading is usually given for it, or that it has been understood that the vessel undertook with regard to it the obligations of a carrier. The carriage of money cannot by any construction of the charter-party be found within its terms. It is an employment well known to be attended with exceptional risks of every sort, for which carriers are usually specially compensated. It would seem in the highest degree improbable that vessel-owners would make no difference in the rate of compensation for assuming responsibility for stone-ballast, and the great risk of the safe carriage and delivery of

sufficient gold to purchase a cargo. If such an interpretation of the charter is sought to be made out by usage, there is every reason that the usage should be required to be certain, uniform, and established.

There are authoritative cases which hold that where, by settled course of business and custom, a carrier who undertakes the carriage of goods for sale, is, without any additional compensation, to bring back the proceeds of the goods and pay the money over to the shipper, that the vessel and owners are bound for the master's default if he does not pay over the money; it being held that under the usage the whole business was one employment, all compensated for by the freight. *Kemp* v. *Coughtry*, 11 Johns. 107; *Emery* v. *Hersey*, 4 Greenl. 407. But these were cases of common carriers, and not of vessels specially chartered for a lump sum. The amount of money to be returned was dependent on the amount of merchandise for which freight was paid, and therefore bore a direct relation to the compensation received. In cases similar to the present one this element of certainty is wanting. The money sent out is a mere estimate of the cost of the return cargo. In the voyage just before the present one these charterers sent out by this same master $2,500 in gold, besides merchandise, together sufficient in value to pay for two cargoes,—one to be sent home by a vessel they expected to obtain in the Bahamas.

After a careful consideration of this case, I have not been able to find any usage proved which can control the charter-party, and am of opinion that in taking the gold the master acted as bailee for the charterers, and not in his own capacity as master. If, in a similar case, it is intended that gold shall be carried under the contract of affreightment, nothing is easier than to so word the charter-party.

Libel dismissed.