### SEAGAR v. NEW YORK & C. MAIL STEAMSHIP CO.[1]

(District Court, S. D. New York. June 21, 1892.)

1. SHIPPING—DELIVERY OF CARGO—CUSTOMARY FACILITIES—WHARF FACILITIES.

The contract in a charter party to discharge with "customary dispatch" is fulfilled if the vessel is afforded the customary facilities for speedy discharge; and hence, when charterers furnish ample dock room for a vessel, but the latter, either through misapprehension on the part of her stevedore, or acting under direction of the consignees of the cargo, given without the knowledge of the charterers, so discharge her cargo as to block the dock, and thus occasion delay, the charterers are not liable for demurrage.

2. SAME — "DELIVERY WITHIN REACH OF SHIP'S TACKLES" — VESSEL'S DUTY AFTER DELIVERY ON WHARF.

The clause in a charter that goods are to be delivered "alongside and within reach of the ship's tackles" does not necessarily require the consignee to receive the goods directly from the tackles, and determines nothing as to what may be required of the ship after the goods have been dropped from the tackles. The deposit of certain goods in tiers on the wharf has long been the ordinary practice; hence, where a vessel, after

[1]For opinion on appeal, see 55 Fed. Rep. 880.

discharging bales of hemp, voluntarily piled them in tiers, and there was no evidence that such piling was excessive or unreasonable, or beyond the ordinary practice, *held,* that there was no implied contract on the part of the charterer to reimburse the ship for such labor.

In Admiralty.   Libel for demurrage and for extra compensation for handling freight.   Dismissed.

Convers & Kirlin, for libelant.
Carter & Ledyard, for respondents.

BROWN, District Judge.   The contract in the charter party to discharge with "customary dispatch" is fulfilled if the vessel is afforded the customary facilities for speedy discharge.   Steamship Co. v. Dempsey, [1892] 1 Q. B. 854.   In the present case there were but two consignees of the hemp cargo, though the three bills of lading specified numerous lots of different marks and numbers.   All the hemp, however, was directed by orders from the receivers to the same storehouse.   The evidence shows that the customary mode of handling cargoes of hemp is that the bales are not removed until all have been discharged; to place together the bales that are for the same consignee; to separate the lots going to different consignees; and to pile such as are deliverable to the same consignee on top of each other, in two or three tiers.

In the present case abundant space was furnished to the ship by the respondents, the charterers, for the discharge of the whole cargo on the dock in the customary manner.   The blocking of the dock and consequent delay arose solely from the ship's attempt to keep separate, not merely the bales belonging to the different consignees, but the different lots of the same consignee, according to the different marks.   These lots were mostly of so few bales as not to admit of piling; and their separation required also much additional space for the passages between them.   Had the bales consigned to the same consignee been placed together and piled in the usual manner, there would have been abundance of room for the complete discharge of the cargo upon the dock without blocking or delay.

It is contended that orders were given by the receivers at the dock to keep separate the different lots.   I do not think this claim is fairly established.   The separation made by the ship's stevedore seems to have been made through misapprehension and mistake; and, on the Friday before the days for which the demurrage is claimed, this misapprehension was corrected by instructions that only Thebaud's consignment was to be kept separate; and there was abundant room for this.

Even if the transferees of the cargo had given instructions that all these separate lots were to be kept distinct, such instructions were without the knowledge or authority of the charterers, who are the respondents in this action.   Such instructions would have been in excess of the rights of the two consignees and receivers of the goods.   It was no part of the ship's duty to obey such instructions except upon her own contract for extra compensation and such arrangements as respects facilities for discharge as she might make.

The charterers could not be bound by such instructions given without their knowledge or consent, nor were they required to provide the additional facilities for discharge which such unusual separation of lots might necessitate.

. The consignees of the goods were not the agents of the charterers. The latter were bound under the agreement for "customary dispatch" to furnish sufficient space for discharge in the customary manner. If, on the request of the receivers of the goods, the ship undertook a different mode of discharge for their convenience, she must look to them, not to the charterers, for compensation or indemnity.

2. A claim is also made for extra handling in piling some of the bales, on the ground that the charter only required the ship to deliver "alongside and within reach of the ship's tackles," and that such piling was an extra service for the benefit of the charterers, for which the ship is entitled to compensation either upon an implied promise to pay, or as for a substituted expense, which saved the charterer a larger charge for demurrage.

If the obligation of the charterer to receive "within reach of the ship's tackles" were in any way incompatible with "customary dispatch," or with the customary facilities in discharging, and with the duty which, as the evidence shows, the custom would impose upon the ship to do more or less of piling within the allotted space on the dock, then the written provision, which required of the charterer only "customary dispatch," would probably be held to control the printed form, "within reach of the vessel's tackles," because the written parts are the "immediate terms selected by the parties" to express their intention. Insurance Co. v. Bowring, 1 U. S. App. 183, 193, 1 C. C. A. 583, 50 Fed. Rep. 613.

But there is no necessary incompatibility between these terms of the charter, and none should be raised by construction. To deliver within reach of the ship's tackles is a very different thing from requiring a merchant to receive the goods directly from the ship's tackles, as in the case of The Santee, 7 Blatchf. 186, or at the very point where the tackles may drop them without any further handling by the ship. In the absence of a special contract, something more than this is required of the ship, not merely by immemorial practice, but by the law itself. The legal duty of the ship to keep separate the consignments of goods going to different consignees is incompatible with the latter construction of this clause. On the argument, also, it was admitted that the vessel had other handling to do after dropping the bales from the tackles. The object of the provision for "delivery alongside and within reach of the ship's tackles" is to secure a certain convenience to the ship by not requiring her to carry the goods for deposit beyond a certain easily determinable limit of space, viz. the reach of her tackles, as a measure of distance. This is the practical construction which usage has placed on the phrase. It has nothing to do with the ship's obligation within those limits, and determines nothing as to how much may be required of her after the goods are dropped from her tackles. The deposit of goods in tiers more or less upon the docks and wharves

has been the ordinary practice from time immemorial as respects a great variety of goods. What is or is not a reasonable handling, in this regard, within a space not beyond the reach of the ship's tackles, is a matter properly falling within the scope of the custom and practice of merchants to determine. These customs, as well as those relating to "customary dispatch" at the port of destination, so far as they are lawful and reasonable, are presumably within the intent of both parties to the charter and form a part of their contract. Smith v. Pine Lumber, 2 Fed. Rep. 396; Lindsay v. Cusimano, 10 Fed. Rep. 302, 12 Fed. Rep. 504. Here the allotted space was "within reach of the ship's tackles." There is no evidence that the piling done or expected was either excessive or unreasonable, or beyond the ordinary practice. It was not incompatible with the provisions of the charter; and having been done voluntarily by the ship, and in accordance with the custom, there is no implied promise or duty of the charterer to reimburse her. Even departures from the charter provisions, when voluntarily adopted, and without objection, may be treated as a waiver of the literal provisions of the formal parts of the charter. Arreco v. Pope, 36 Fed. Rep. 606. On the former grounds, however, the libel should be dismissed; but under the circumstances of mistake, as indicated, without costs.