## HINCKLEY et al. v. WILSON LUMBER CO.

### THE MAUD H. DUDLEY.

(District Court, D. Maine. June 2, 1913.)

No. 246.

1. SHIPPING (§ 45*)—CHARTER—CONSIGNMENT OF VESSEL TO THIRD PARTY FOR LOADING.

· When a charterer consigns the vessel to another for loading, he makes himself responsible for the acts and omissions of such consignee the same as though he had directed the vessel consigned to himself at the same place.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 177–181; Dec. Dig. § 45.*]

2. SHIPPING (§ 62*)—CHARTER—DUTIES OF MASTER.

The master of a chartered vessel is the agent of the ship, and represents the owner in the performance of the charter, and he cannot be required to act for or to assume duties on behalf of the charterer which might prejudice the interests of the owner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 257–269, 313–315, 317; Dec. Dig. § 62.*]

3. SHIPPING (§ 177*)—CHARTER—LIABILITY OF CHARTERER FOR DEAD FREIGHT.

Libelants chartered a schooner to respondent for the carriage of a full cargo of kiln-dried yellow pine lumber at a stated freight per thousand feet. Respondent had purchased from a manufacturing company lumber of the kind specified in the charter, and consigned the vessel to such company for loading. A large portion of the lumber loaded was not kiln-dried, but was wet and heavy, in consequence of which the vessel could not carry the quantity she could have taken of kiln-dried lumber. *Held*, that the master was under no duty to the charterer to refuse to receive the lumber tendered, nor in fault ·for signing a bill of lading for kiln-dried lumber, but that the charterer was responsible for the action of its consignee and liable under the charter for the shortage of cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. § 177.*]

4. SHIPPING (§ 45*)—DEMURRAGE—LIABILITY OF CHARTERER—CUSTOMARY DISPATCH IN DISCHARGING.

The charterer having sold the cargo consigned the vessel to the purchaser for discharge, but, after she had partially discharged, the consignee refused to receive more because of the quality of the lumber, and she suffered a considerable delay before fully discharged. *Held*, that the charterer was liable for demurrage at the rate fixed by the charter for such delay under a provision of the charter for customary dispatch in discharging which entitled her to be discharged with due diligence according to the lawful and reasonable custom of the port.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 177–181; Dec. Dig. § 45.*]

In Admiralty. Suit by Frederick J. Hinckley and others, as owners of the schooner Maud H. Dudley, against the Wilson Lumber Company. Decree for libelants.

Benjamin Thompson, of Portland, Me., for libelants.

Symonds, Snow, Cook & Hutchinson, of Portland, Me., for respondent.

HALE, District Judge. This libel is brought by the managing owner of the three-masted schooner Maud H. Dudley against the charterer to recover dead freight and demurrage arising out of a charter of the vessel. The schooner is of the burden of about 328 tons, owned by the libelants, and employed by them in the lumber and coal trades between southern ports and New England ports. The managing agent brings the libel for the owners.

At the time in question Capt. Charles Grover, an experienced shipmaster, was in command of the schooner. The case shows that on May 17, 1912, the respondent purchased of the Gress Manufacturing Company, a corporation at Jacksonville, Fla., 300,000 to 325,000 feet of 1 by 6 yellow pine, kiln-dried lumber. On June 3, 1912, the libelant, the managing agent of the schooner, chartered her to the respondent. The material part of the charter party follows:

"This charter party, made and concluded upon in the city of Boston, the 3rd day of June 1912, between F. J. Hinckley, agent of the schooner 'Maud H. Dudley' of Bath of the burthen of 328 tons, or thereabouts, register measurement, now lying in the harbor of coasting of the first part; and the Wilson Lumber Company, of the second part, witnesseth, that the said party of the first part agrees on the freighting and chartering of the whole of the said vessel (with the exception of the cabin and necessary room for the crew, and storage of provisions, sails and cables), or sufficient room for the cargo hereinafter mentioned, unto said party of the second part, for a voyage from Jacksonville, Fla., to Augusta, Me. Charterers agree if vessel's draft does not permit her to safely go to Augusta, that they will receive sufficient cargo at Gardiner to lighten vessel to safe draft, and they agree to pay towages from mouth of Kennebec River to Augusta and back again, via Gardiner, if necessary, on the terms following: The said vessel shall be tight, staunch. strong and in every way fitted for such a voyage, and receive on board during the aforesaid voyage, the lawful merchandise hereinafter mentioned. The said party of the second part doth engage to provide and furnish to the said vessel a full cargo under and on deck of yellow pine, kiln-dried lumber, and to pay to said party of the first part, or agent, for the use of said vessel during the voyage aforesaid seven dollars ($7) per thousand feet, board measure delivered. Freight payable in cash on proper discharge of cargo. Vessel to be free of wharfage while under this charter. Charterers have privilege of appointing stevedores for loading and discharging provided rates are no more than charged by other competent stevedores. It is agreed that the lay days for loading and discharging shall be as follows (if not sooner dispatched), commencing not prior to July 1st, from the time the captain reports his vessel ready to receive or discharge cargo for loading, cargo to be delivered at an average rate of not less than 40 M ft. per weather working day, Sundays and legal holidays excepted, and customary dispatch for discharging. And that for each and every day's detention by default of said party of the second part, or agent, thirty-two (32) dollars per day, day by day, shall be paid by said party of the second part, or agent, to said party of the first part, or agent. The cargo or cargoes to be received and delivered alongside, within reach of vessel's tackles, free of lighterage, sufficient water guaranteed."

On July 23, 1912, the schooner arrived at Jacksonville; and on July 26th docked at the wharf of the Gress Manufacturing Company, of which company the charterer had purchased the cargo. The following day the schooner's loading began. The first lumber put aboard the schooner was taken from a lighter; some 30,000 to 40,000 feet of this lumber appeared to be kiln-dried lumber; Capt. Grover says it was nice looking, clean lumber. Afterwards some of the lumber came

from the wharf; and this, Capt. Grover says, was sap lumber, heavy, and not kiln-dried. The captain was assured, however, that it was kiln-dried lumber. On August 3d the Dudley was loaded, so that her scuppers were practically to the water's edge. During the loading Capt. Grover complained that the lumber was wet and heavy, and that his vessel would not be able to take a full cargo; but the shippers gave him assurance that the lumber was kiln-dried, and continued to deliver it to the schooner. On August 3d the master signed this bill of lading:

"Shipped, in good order, and well conditioned by Gress Manufacturing Co., on board the schooner called the Maud H. Dudley whereof ———— is master, now lying in the port of Jacksonville, Fla., and bound for Augusta, Me. To say: 39334 pieces rough kiln-dried boards said to contain 292645 ft. (two hundred ninety two thousand six hundred forty five feet) of which 10500 feet is on deck. More or less all on board to be delivered, being marked and numbered as in the margin; and are to be delivered in the like good order and condition at the port of Augusta, Me. (the dangers of the seas only excepted), unto Wilson Lumber Co., or to their assigns, he or they paying freight for the said lumber at the rate of as per charter party without primage and average accustomed. In witness whereof, the master or purser of said vessel hath affirmed to bills of lading all of this tenor and date; one of which being accomplished, the others to stand void.

"Dated in Jacksonville, Fla., the 3rd day of August, 1912.

"Chas. Grover."

On the same day he sailed for the Kennebec river, where he arrived on August 25th. Notice of his arrival was given to Mr. Wilson of the respondent company, who arranged with the Knickerbocker Steam Towage Company in accordance with the charter, to tow the schooner up the Kennebec river. Upon the arrival of the schooner at Gardiner, a portion of the cargo was discharged in order to lighten her; the balance of the cargo was carried to Augusta. After the discharge of the greater part of the deck load, the consignee, to whom the charterer had sold the cargo, refused to receive any more of it. The schooner was towed back to Gardiner, the cargo previously discharged was reloaded, and then the Dudley was towed to Portland, where her discharge was completed. The libelants now seek to recover of the respondent as dead freight the difference between the 292,000 feet of lumber on board and 395,000 feet, her average loading capacity of kiln-dried lumber. They seek also to recover for the respondent's failure to give the vessel "customary dispatch" in discharging.

It will be seen that the whole carrying capacity of the schooner was let to the respondent, and that the respondent had already bought its cargo, and was to furnish it to the vessel. It was the duty, then, of the respondent to furnish to the schooner a full cargo, under and on deck, of yellow pine, kiln-dried lumber. It was the duty of the owners of the vessel to furnish a tight, staunch, strong vessel for the voyage, and to receive on board, stow, transport, and discharge the cargo which the charterer had agreed to furnish. The vessel was sent to the Gress Manufacturing Company, the shipper of the lumber, from which company the charterer had bought it, and to which it had intrusted the duty of bringing it to the vessel. The captain of the vessel was placed in communication with no one else except the Gress Manufacturing Company, the shipper, and looked to it to put aboard the vessel the

lumber the vessel was to transport. At the trial of the cause the learned counsel for the respondent contended that the master ascertained that a portion of the lumber was not kiln-dried; that the owners are bound by the action of the master of the vessel in receiving a cargo not called for by the charter party, and cannot collect of the charterer in the present proceeding, either dead freight, or for the respondent's failure to give the schooner customary dispatch in discharging; that the character of the lumber could be easily seen from inspection; that the captain of the schooner did, in fact, see a portion of it and knew it was not kiln-dried; and that, in accepting it and putting it aboard the vessel, he waived the provisions of the charter, and cannot now recover under it. When I heard the case, I thought there was some basis for this contention. It seemed to be quite doubtful whether it was not the duty of the master of the schooner, when he found that a portion of the cargo was not up to the requirements of the charter, to refuse to receive it, to notify the charterer, and to await further orders. Upon a careful examination of the testimony, however, and of the law controlling the case, I am clear that the contention of the respondent cannot be sustained.

[1] The contract was between the charterer and the owners of the vessel. The master of the vessel was the agent of the owners, the only agent to whom they looked to protect their interests. The success of their venture was in his hands. In carrying out the contract it was his duty to act for the owners. The master is the agent of the ship. In a case like this, where the question arises under a contract between the charterer and the owners of the ship, the master must be held to be the agent of the owners. To him is intrusted the duty of receiving, stowing, transporting, and discharging the cargo. The charterer had intrusted to the shipper the duty of bringing the cargo to the vessel. In this circuit, in Donnell v. Amoskeag Manufacturing Co., 118 Fed. 10, 11, 55 C. C. A. 178, 179, the charter provided:

"Vessel to report to the Consolidation Coal Co., Baltimore, for orders, it being understood vessel shall be loaded by them in turn."

In speaking for the Court of Appeals, Judge Putnam said:

"By consigning the vessel to the Consolidation Coal Company, the Garfield & Proctor Coal Company, in whose shoes the claimant stands, made itself responsible for the acts or omissions of the consignee."

In Peck v. United States (C. C.) 152 Fed. 524, a case which arose in the Second Circuit, the Circuit Court followed Donnell v. Amoskeag Manufacturing Co., and held:

"In the absence of some agreement to the contrary between owner and charterer or some evidence showing a contrary intent, the party who is to load the vessel will be deemed the agent of the charterer." Harding v. Cargo of Coal (C. C.) 147 Fed. 971, 981; Berkley v. Watling, 7 Adolphus & Ellis, 29; Sears v. Wingate, 3 Allen (Mass.) 103, 108; Thorndike v. Rokes, 76 Me. 396, 398.

[2, 3] In the case before me, I am of the opinion that by intrusting to the Gress Manufacturing Company the duty of bringing the cargo to the ship the charterer made itself responsible for the acts or omissions of the shipper. The charterer had bought its cargo of the ship-

per, and looked to the shipper to bring the cargo to the ship. If the shipper failed in its duty, it may be compelled to answer in damages for such failure. The charterer cannot look to the ship, or its master, or owners, for protection against the shipper. The master had the plain duty to represent the owners of the schooner in the performance of their obligations under the charter. With his liability to the owners, he could not take upon himself further liabilities and duties to the charterer. If he had stopped to write or telegraph to the charterer that he had reason to think the shipper was not performing its obligations, and was not, in fact, putting yellow pine, kiln-dried lumber aboard the schooner, he would have involved his owners in new liabilities where their rights would have been at least questionable. He might have made delays for which the owners could not hold the charterer liable. He might have caused loss to the owners, and have affected their contract rights. No question is made by the charterer but that the master acted in good faith. Mr. Wilson made no complaint of Capt. Grover's action in receiving the cargo, or in signing the bill of lading; and it does not appear in testimony that he has ever made such complaint. In his conversations with Capt. Grover touching his attempts to effect an adjustment with the shipper he has not taken the ground that Capt. Grover had in any way misled him, or that he had failed to perform his duty. It appears from the testimony of Capt. Grover that as the cargo came aboard he did not attempt to keep any tally of it; that a part of the lumber he saw coming aboard from the lighters seemed to be kiln-dried; that some of the lumber which came from the wharf did not appear to be kiln-dried, and that he called the attention of the shipper to it, who assured him that it was kiln-dried; that he complained that his vessel could not carry half a cargo of the heavy stuff which was put aboard the schooner. In my opinion it was not the duty of Capt. Grover to go further and act as a detective. It was not his duty to assume to be an expert as to the quality of the goods he was hired to transport. It was not for him to say that the charterer was not getting what it had bought. If he found the lumber of bad quality, it was not for him to decide whether the charterer was undertaking to impose a poor quality of goods upon its consignees, or whether the shipper was trying to make such imposition upon the charterer. If the master had undertaken to exercise such a latitude of power by assuming duties that did not belong to the ship, or to its master, he might have released the charterer from its contract with the owners. It is only when the contract is at an end by misfortune that the master of the ship is given general powers in the premises. It would be imposing too great a burden upon him to give him those powers during the life of the contract; and it would certainly be imposing upon him too serious a duty; for in the exercise of that duty, in his general desire to serve somebody else, he might destroy his power to serve his owners, and might bring most serious consequences upon them. In assuming a power which he did not have he might have interfered with a duty which he did have. It was not for him to decide which party, if either, was in dereliction of duty in furnishing goods to the ship under the charter. Within reasonable

limitations, his simple duty was to take the goods from the shipper, stow them, transport them, and discharge them. Whitman v. Vanderbilt, 75 Fed. 422, 423, 21 C. C. A. 422; Stepanovit v. Gillibraud, Fed. Cas. No. 13,360. In a contract like this, it was not in his power to vary its terms, or to waive its provisions. The Dictator (D. C.) 30 Fed. 637; Garfield & Proctor Coal Co. v. Fitchburg Railroad Co., 166 Mass. 119, 44 N. E. 119; Gracie v. Palmer, 8 Wheat. 605, 5 L. Ed. 696; Balcarres Brook S. S. Co. v. Grace, 75 Fed. 1017, 1019, 22 C. C. A. 7; Merchants' Banking Co. v. Cargo of the Afton, 134 Fed. 727, 729, 67 C. C. A. 618; Hart v. Leach (D. C.) 21 Fed. 77, 78. It must generally be said that the master ought to do nothing which can release the charterer from his liability under the charter. The rule of reason must, of course, be applied in construing all contracts. And in carrying out a contract where extremely burdensome conditions arise the master is allowed reasonable discretion in the premises. Gracie v. Palmer, 8 Wheat. 605, 639, 5 L. Ed. 696; Beecher v. Bechtel, Fed. Cas. No. 1,221; The Lloyd (D. C.) 21 Fed. 420, 422. The case shows that the schooner did not receive a full cargo of kiln-dried lumber, as she had a right to expect under the terms of the charter; that the failure to receive a full cargo was due to the act of the charterer; and that the charterer was responsible for the acts or omissions of the Gress Manufacturing Company, the shipper. The testimony is convincing that the charterer ordered kiln-dried lumber of the shipper; and, through the fault of the shipper, a large portion of the lumber brought to the ship was not kiln-dried. The undisputed testimony shows that the schooner carried 292,000 feet of lumber, and that she might have carried at least 395,000 feet. The schooner, therefore, fell short 103,000 feet of her full cargo. She suffered damages, then, at the rate of $7 per thousand feet, or the full sum of $721.

[4] The charter party provided that the vessel should receive "customary dispatch for discharging." By "customary dispatch" is meant discharging with due diligence according to the lawful, reasonable, well-known custom of the port of discharge. Smith v. 60,000 Feet of Yellow Pine Lumber (D. C.) 2 Fed. 396; Seagar v. New York & C. Mail S. S. Co. (D. C.) 55 Fed. 324, affirmed 55 Fed. 880, 5 C. C. A. 290. The case shows that the schooner did not receive customary dispatch for discharging. She was compelled to lie idle at the wharf both at Randolph and at Augusta, because the consignee had refused to receive the cargo. In consequence of such refusal, it was necessary to reload the cargo in order to carry it to Portland. So far as there is any testimony offered, the case appears to show that customary dispatch on the Kennebec river was at least 30,000 feet per day. The discharge of 395,000 feet should, then, have been completed in 13 days 1⅔ hours. In fixing the lay days, Sundays and holidays should be excluded. There should also be allowed the three hours consumed on August 30th in towing from Randolph to Augusta. For the lay days there should, then, be allowed 13 days 4⅔ hours. As thus computed, the lay days expired at 3:40 o'clock on the afternoon of the 11th day of September. But, instead of being so discharged, the schooner did not reach the Kennebec river until the 5th day of October. After the

expiration of the lay days, Sundays and holidays should be included in the demurrage; that is, after the lay days the demurrage runs day by day. I find that there were 24 days demurrage at $32 per day, for which the sum of $768 is properly charged. I have not undertaken to recite all the detailed testimony.

In my opinion the libelants are entitled to a decree of $721 for dead freight and $768 for demurrage. They are, then, entitled to a decree for $1,489, with interest from the 31st day of January, 1913. Inasmuch as the testimony relating to damages has all been submitted to me, I have assumed that both parties desire me to pass on the question of damages without reference to an assessor. A decree, then, may be entered for the libelants for $1,489, with interest from January 31, 1913.