## BAILEY v. MANUFACTURERS' LUMBER CO.

(District Court, S. D. New York. June 22, 1915.)

1. SHIPPING ⊜⟶171—DEMURRAGE—LAY DAYS FOR LOADING AND DISCHARGING.
   Under a charter party which fixes the same rate of speed for loading and discharging, the time for loading and discharging is not to be brought into hotchpot, but each period is to be reckoned separately.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. ⊜⟶171.]

2. EVIDENCE ⊜⟶21—JUDICIAL NOTICE—DEMURRAGE—CUSTOM OF PORT.
   Where a charter party provides that discharge shall be according to the custom of the port of discharge, the court cannot take judicial notice of such custom, but the same must be proved.
   [Ed. Note.—For other cases, see Evidence, Cent. Dig. § 25; Dec. Dig. ⊜⟶21.]

3. SHIPPING ⊜⟶177—DEMURRAGE—DELAY IN OBTAINING DISCHARGING BERTH.
   In the absence of provision to the contrary in a charter party, delay in obtaining a berth for discharging is at the charterer's charge.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. ⊜⟶177.]

4. SHIPPING ⊜⟶177—DEMURRAGE—DELAY IN OBTAINING PAPERS.
   Delay in obtaining the necessary papers from the customhouse for discharging a vessel, if through the fault of the authorities, and not of the ship, is at the charterer's charge.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 576–582, 584; Dec. Dig. ⊜⟶177.]

---

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. Shipping ⊙183—Demurrage—Rate Fixed by Charter Party.
    Where the rate of demurrage is agreed upon in a charter party, the agreement will be given effect as for liquidated damages, unless it clearly appears that the real intent was to provide for a penalty.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 593; Dec. Dig. ⊙183.]

In Admiralty. Suit by George Bailey against the Manufacturers' Lumber Company. Decree for libelant.

Arthur Lovell, of New York City, for libelant.
Roscoe H. Hupper, of New York City, for respondent.

LEARNED HAND, District Judge.   [1] The charter party contains the clause:

"It is agreed that the lay days for loading and discharging shall be as follows: At an average rate of not less than forty thousand superficial feet of lumber or equivalent of laths, per weather working day."

The first point is whether the time taken in loading and discharging shall all be brought into hotchpot, or whether each period must be reckoned separately. The authorities are not very helpful. Judge Brown's decision in The Ocean Prince (D. C.) 50 Fed. 115, does not raise the question at all, because the ship earned dispatch money on both loading and discharging; it was not, therefore, necessary to bring both periods into hotchpot. In Marshall v. Bolckow, Vaughan & Co., L. R. 6 Q. B. D. 231, the rate was different for loading and for discharging, unless "loaded at other than Portugalette or Lucana shipping staithes," when it was to be the same. The loading did not take place at either of the ports mentioned, and was therefore in fact subject to the same rate as discharge. The ship claimed the right to separate the periods, as here, and the court decided with the ship; but it is not clear that the decision would have been the same, had the main body of the charter party not distinguished between the rates.

Avon S. S. Co. v. Leask, 18 Session Cases (4th Series) 280, is a stronger case for the libelant. There the charter read:

"Cargo to be loaded and discharged as fast as steamer can receive and deliver during usual working hours."

The court by a vote of three to one decided that each period must be reckoned separately, because otherwise the ship's lien for demurrage could not exist, and because customarily the intent to merge the whole period into one appears if intended. The first consideration applies to the case at bar, the clause of the charter party at bar being:

"Vessel to have an absolute lien on cargo for freight, dead freight, and demurrage."

If the charter brings the whole period into hotchpot, no lien arises for demurrage in loading, until it appears during the period of discharging that with the utmost expedition the average rate for both periods would be less than the charter requires. Even then the lien could not be measured until all had been delivered and the lien lost. Such an interpretation would make the provision for a lien wholly im-

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

practicable, as well as any right to recover at once for any demurrage arising in loading. This, as usual, is recoverable de die in diem, which, while it cannot in any case be construed literally, has possible meaning if the periods are kept separate. Had it been shown that the probable speed of loading and of discharge were different, I should feel greater force in the respondent's argument; but in the absence of such proof I am entitled to assume that the lumber was expected to go aboard no faster than it went ashore; if so, I regard the average as meaning the rate at which each operation should be completed, making allowance for variations while it went on, rather than to permit what at its completion turned out to be an expeditious loading, to make amends for a dilatory discharge. No doubt the question is somewhat casuistical, but I shall follow the Scotch case for the reasons stated.

[2, 3] The next point is the delay in obtaining a berth. The charter party provides that discharge shall be according to the custom of the port of discharge. No custom of the port was shown, and I cannot take judicial notice of any; in Gates v. Ryan (D. C.) 37 Fed. 154, a custom was proved. This case is like Swan v. Wiley, Harker & Camp Co., 161 Fed. 905, 88 C. C. A. 510, where no custom was proved and the delay in obtaining a berth was at the charterer's charge. Similarly in Leary v. Talbot, 160 Fed. 914, 88 C. C. A. 96, delay in finding berths after the first was at the charterer's charge, though the fault was that of a customs inspector. Finally, any delays at the wharves are at the charterer's charge, whether because they were too crowded for discharging at full capacity, or because the consignee wrongfully refused to receive the cargo. Donnell v. Amoskeag Mfg. Co., 118 Fed. 10, 55 C. C. A. 178; Peck v. U. S. (C. C.) 152 Fed. 524. These were cases of default in loading by the charterer's consignee, but the question is no different when the fault is the consignee's in failing to make a prompt discharge. Hinckley v. Wilson Lumber Co. (D. C.) 205 Fed. 974. Such undertakings are made by the charterer. Carver, Carr. by Sea, 610; Leary v. Talbot, supra. It makes no difference that the employment and pay of stevedores is an obligation of the master; the charterer must see to it that the agreed rate of loading or discharge is continued, unless the master interfere. In West Hartlepool Steam Nav. Co. v. Va.-Car. Chem. Co., 164 Fed. 836, 90 C. C. A. 288, the relief sought was against the cargo and consignee, not the charterer; there was not enough proof to hold the cargo under the bill of lading. If the language of the Circuit Court of Appeals means that it is only when the charterer has actively contributed to the delay that he is responsible, I cannot follow the decision. If it means that a strike will excuse the charterer from his obligation to discharge the ship, it is not apposite.

The cesser clause has no application. Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106. The bill of lading, signed by the master, did not incorporate the charter party, and gave no lien upon the cargo and no obligation against the consignee for demurrage. Dayton v. Parke, 142 N. Y. 391, 37 N. E. 642. In such case, if the cesser clause relieved the charterer, there would be no obligation for

demurrage at all; hence it does not operate. Its effect is only upon those liabilities which are capable of transference to cargo or consignee under the bill of lading.

[4] Next is the delay at Black Tom and at Newark in getting the necessary papers from the customhouse. All usual and necessary delays for that purpose are at the charterer's charge, since it rests with him to say how often and when the ship shall be moved, and at how many places cargo shall be discharged. Any delay in getting the papers at a given place, caused by the ship's failure to have on hand or keep proper tally sheets or other documents, is at the ship's charge; but if it is the authorities who are at fault, then under Leary v. Talbot, supra, it is at the charterer's. The only deduction of demurrage from the morning of July 29th will be for delays due to the failure of the ship to have the proper papers ready for customhouse officials.

[5] Finally comes the question of the agreed demurrage. If parties agree in words upon stipulated damages, it should abundantly appear that they did not mean what they say, and that what they really were doing was providing for a penalty. If that does appear, then, of course, the penalty will not be enforced. To agree upon a fixed sum for demurrage in a charter party is to say in the most positive way that the sum is liquidated damages for detention. Unless it pretty clearly appears that the real intent was otherwise, no court ought to interfere. New York & N. E. R. R. Co. v. Church, 58 Fed. 600, 7 C. C. A. 384. The respondent has not cited any case which in the least affects this principle, unless it be The Colombia (D. C.) 197 Fed. 661, affirmed 199 Fed. 990, 117 C. C. A. 666; but even that case proceeded upon the theory that the stipulated demurrage would be allowed, unless the actual damages were shown to be less, though the court decided upon the facts that there was no damage shown. I think the pertinent point of time is when the contract is made. If, then, the parties are honestly trying to arrange in advance a fair basis for actual damages, it makes no difference whether it turns out too much or too little. Such agreements are most desirable when the parties act upon an equality, and courts should encourage them to the utmost, instead of being "disposed to lean against" them, as suggested in Keeble v. Keeble, 85 Ala. 552, 5 South. 149.

In the case at bar there is absolutely nothing to lead one to suppose that the sum was not put in in good faith. The charterers called no one to show how it was arrived at, or to show that it was not what it purports to be. They rest upon the earnings of this voyage, and even those are not conclusive, since we do not know whether the parties contemplated a larger cargo, or how long they thought it would take to load and discharge. The lay days are the outside limit, after which the charterer must pay; they are not necessarily the expected period. The voyage from Bathurst to New York took 20 days; the loading at Bathurst 10 days; the voyage to Bathurst probably a week more. This period, at $76, would, it is true, amount to all the freight earned upon the voyage, with no allowance for the time of discharge at New York. However, we cannot tell whether voyages west were as prof-

itable as voyages east at that time, nor what hire the parties thought the ship could earn in New York. This all rests with the charterer to show, and until he shows that the contract is illegal the actual damages are irrelevant. The almost, if not quite, universal practice of this port is to follow such provisions. I should be unwilling to upset that practice without the clearest proof that the practice did not intend as it reads.

A decree will pass for demurrage from July 29th, with the possible exception of delays due to the ship's default as noted. It will hardly be necessary to have a reference.