## Case No. 1,281.

### BELMONT v. TYSON.

[3 Blatchf. 530; [1] 36 Hunt, Mer. Mag. 202.]

Circuit Court, S. D. New York. Sept. Term, 1856. [2]

SHIPPING—CHARTER PARTY—CONSTRUCTION—CUSTOM—ARBITRATION.

1. Where a vessel was chartered, by A. to B., to carry a full cargo of timber from Apalachicola to Liverpool, at a specified freight per load of so many feet, payable at Liverpool, with a stipulated demurrage for detention, and it appeared that she took on board, in the harbor of Apalachicola, all she could safely take, in view of her draft of water, and then went outside to a proper place to complete her loading, she drawing, when fully laden, from two to three feet more water than the greatest depth on the bar, and the charterer claimed that he was not bound to put on board any cargo outside: *Held*, that the charterer was chargeable with knowledge of the tonnage and draft of water of the vessel, and of the state of the harbor; that the parties must be presumed to have understood that the vessel was to go outside to finish her loading; and that the charterer was liable for the stipulated demurrage, while the vessel was detained outside, waiting for cargo.

[Cited in Isaksson v. Williams, 26 Fed. 645. See, also, Thornton v. Carson, 7 Cranch, (11 U. S.) 596.]

2. *Held*, also, that the charterer was liable to pay, at Liverpool, the stipulated freight,

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]
[2] [Affirming Case No. 14,316.]

without reference to any custom there, as to deducting for defective pieces of timber.

3. *Held*, also, that an arbitration entered into, at Liverpool, between the consignee of the vessel and the consignee of the cargo, as to the rule of measurement of the timber, which resulted in an award in favor of the charterer, was not binding upon the charterer, and that, therefore, it could not bind the owner of the vessel.

[Error to the district court of the United States for the southern district of New York.]

At law. This was a writ of error to the district court. [William] Tyson brought a suit in that court against [August] Belmont, who was consul of the emperor of Austria, to recover damages for the breach of a charter-party, made at New York, January 31st, 1848, by which the ship Probus was chartered by Tyson to Belmont, for a voyage from New York to Apalachicola, and thence to Liverpool. The charter was of the whole of the vessel. By it, Belmont agreed to furnish her with a full cargo of timber, one half of the cargo to consist of spars 64 to 80 feet long, 23 to 31 inches diameter at the butt, and 15 to 20 inches diameter at top; the other half to consist of square timber, 25 to 50 long, and 12 to 18 diameter, and deck plank, with the necessary quantity of small pieces for stowage, consisting of pine, oak, and cedar. Belmont guaranteed that the whole of the cargo should be ready in Apalachicola on the arrival of the vessel, and that it should be sent to the vessel as fast as the captain might require, and the state of the weather might allow; and, in case the vessel was longer detained, Belmont agreed to pay demurrage, at the rate of 100 Spanish milled dollars per day, for every day's detention, which should happen by his fault, or that of his agent. The freight was to be eighty shillings, British sterling, per load of fifty feet, string measurement, with five per cent. primage, payable immediately on the landing of the timber. At the trial, before Betts, District Judge, in February, 1852, the jury found a verdict for the plaintiff for $7,484 24. [Tyson v. Belmont, Case No. 14,316.] The breaches alleged were the failure to have the cargo ready at Apalachicola; the failure to furnish a full cargo; and the detention of the vessel eighteen days at Apalachicola, waiting for cargo. After judgment, Belmont sued out a writ of error from this court. [Affirmed.]

[For proceedings on motion to amend the action by changing its form from debt to covenant, and to amend the declaration by striking out the name of Jans C. De Vries as plaintiff, see Case No. 14,315a.]

Daniel Lord and Jeremiah Larocque, for plaintiff.

Francis B. Cutting, for defendant.

NELSON, Circuit Justice. I. One of the principal questions arising in this case is, whether or not, according to the true interpretation of the charter-party, the charterer was bound to furnish cargo for the vessel outside of the west pass into the harbor of Apalachicola? The judge charged that, if the jury found that the vessel was as deep as it was prudent to load her inside of the pass, and that the master went to a proper place outside in order to complete the lading, the parties must be presumed to have understood that the vessel was to go outside to finish loading, as, upon the contract, she was to have a full cargo. The two entrances into the harbor are called the east and west passes. The east pass will enable vessels to enter drawing some sixteen feet of water; the west those drawing about thirteen. The ship, in this case, entered the east pass, anchored, and took in timber until she drew the sixteen feet, and then passed out, and anchored at the mouth of the west pass, to complete her cargo. When fully laden, she drew from eighteen to nineteen feet of water.

It is insisted, on the part of the charterer, that he was not bound to furnish cargo beyond the quantity which the vessel could receive within the passes, and get safely out to sea. The owner claims, however, that he was entitled to have a full cargo, and that the charterer was bound to furnish outside the remainder necessary to complete it; and this upon the principle, that the charterer must be presumed to have known the size and character of the ship, and the state of the harbor at the place of loading, and that a full cargo could not be put on board unless a part of it were to be taken in outside of the passes. There is some evidence in the case that this is the custom in the instance of large ships receiving cargo at that port. The evidence, however, is slight, and the case in the court below was not put upon that ground. The voyage was from Apalachicola to Liverpool, with a cargo of timber particularly specified. The whole ship was chartered, the freight to be eighty shillings sterling per load. The owner was, therefore, deeply interested in having a full cargo; and, if the charterer is chargeable with a knowledge of the tonnage and draft of water of the ship, and of the state of the harbor, as I am inclined to think he is, then, as he stipulated to supply a full cargo, it seems to me that the ruling of the court below was right, and according to the fair intent and meaning of the charter-party. The full cargo was, in point of fact, delivered outside of the west pass—that is, the cargo was completed at that place. It is claimed, however, on the part of the shipper, that this was upon condition of waiving any claim for demurrage, which is denied by the master.

II. The next material question in the case is, whether or not an arbitration between the consignees of the ship and those of the cargo at Liverpool, in respect to the measurement of the timber, is binding upon the owner of the vessel. The consignees of the cargo claimed that, according to the custom of that

port, the freight was to be paid per load, solid measure—that is, defective pieces, on account of splits, sap and bark, were not to be counted—which made a difference in the freight, in this case, of over three thousand dollars. There was a deduction of one hundred and fifty loads in consequence of these defects. A dispute arose as to the measurement, whether it should be according to the rule at Apalachicola or that at Liverpool; and the consignees of the ship, and those of the cargo, referred the question, as above stated. The arbitrators decided in favor of the usage at Liverpool, and that the measurement must be as between vendor and vendee, in the case of a sale. The reasonableness of this usage, if it exists, is not very apparent. Certainly, the master or owner, in this case, had no right to dictate as to the quality of the timber put on board. The cargo was selected and delivered at the ship's tackle by the agent of the charterer. Even if such a custom exists at Liverpool, as it respects the consignee of the cargo, I doubt if it can be regarded as a defence in a suit against the charterer for the freight. I can understand his contract in no other way than as stipulating to pay the eighty shillings sterling for every load of timber of such quality as he has delivered on board. This is, I think, the clear sense of it. According to the usage, as claimed at Liverpool, if the whole cargo which the shipper saw fit to ship, were there deemed not merchantable, no freight at all would be due or collectable.

The question here, however, is as to the effect of the arbitration. The court below held that it could not bind the charterer, and that, as the award must be mutual, it did not bind the owner. I am inclined to think this position sound. As I hold the true construction of the charter-party to be, that the charterer was bound to pay the freight at Liverpool according to the measurement at Apalachicola, that is, without excluding bark, sap, or splits, I do not see that the consignee of the cargo had any power, in the absence of Belmont, to change it. If the award had been adverse to him, he might have repudiated it. If the consignee had paid higher freight than was stipulated for in the charter-party, clearly, he could not recover it of the consignor-owner; and, if such higher freight had been paid after an arbitration, that would not, I think, help the case. The same principle is also applicable to the consignee of the ship. Neither he nor the master had any power to change the contract of the owner. So far as respects the authority of the consignee of the ship in this case, it may be, upon the facts, that the master, who was part owner, and was present, acting in the matter, though he did not sign the submission, would be bound, and hence that the award would operate upon his interest. This branch of the case must, therefore, rest upon the position laid down by the court below, namely, that the award was void as it re-

spected the rights of the charterer; and that, if so, it could not operate to bind the other party.

There is another consideration that should be stated. If, as is asserted, it is the custom at Liverpool to pay the freight according to the measurement at that port, and not at the port of shipment, the usage can prevail only in cases where such measurement is not inconsistent with the contract in the charter-party, or can prevail only as it respects the implied engagement of the consignee to pay the freight, leaving the obligation of the shipper to stand upon his contract of affreightment; for, it would be difficult to admit that any custom or usage, however well settled, could be allowed to change his express agreement. In this view, the arbitration in the case may possibly be regarded as a mode of ascertaining the amount of freight to be paid by the consignee, leaving the contract in the charter-party unaffected, except so far as the payment of the freight at Liverpool may be taken in abatement of the amount due from the shipper.

There are some minor points raised in the case, but, if the ruling of the court can be maintained upon the two questions that I have noticed, I think the case free from difficulty. These questions are somewhat embarrassing, but, for the reasons stated, I am, as at present advised, inclined to concur in the disposition of the case by the court below, and to affirm the judgment.