HINE et al. v. PERKINS et al.

(Circuit Court of Appeals, Second Circuit. May 23, 1893.)

1. SHIPPING—DEMURRAGE—PROVIDING BERTH.

A chartered vessel reached the port of New York, and proceeded to the designated pier, at 8 A. M., December 10th, but finding the berth occupied, she sought an anchorage. The charterers were notified by 11 A. M. that she would be ready to unload at 7 A. M. the next day. Early in the morning, December 11th, she proceeded to the pier, and, finding the berth still occupied, she went back to her anchorage. The berth was ready for her by 11 A. M., but she did not return until evening, and commenced to unload on the 12th. *Held* that, as the charterers provided a berth within 24 hours after notice of arrival, they were not liable for the delay. 50 Fed. Rep. 434, affirmed.

2. SAME—WANT OF DISPATCH IN UNLOADING.

A charter party provided that the vessel should "discharge as fast as she can deliver in ordinary working hours; any lighterage at port of discharge to be at charterers' risk and expense; vessel to provide sufficient steam to run all cargo winches at one and the same time." The vessel had four hatches from which she could discharge, but was sent to piers where she could use but three, at most. *Held*, that she was entitled to discharge from all four, and the charterers were liable for the delay caused by discharging from fewer. The Glenfinlas, 1 C. C. A. 85, 48 Fed. Rep. 758, distinguished. 50 Fed. Rep. 434, reversed.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. This was a libel by Wilfred Hine and another against James D. Perkins and another, which was dismissed, in part, by the lower court, and a decree entered in favor of the libelants as to the residue. Libelants appeal. Reversed.

J. P. Kirlin, for appellants.

Chas. E. Souther, for appellees.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. The libel was filed by the owners of the British steamship Netherholme to recover damages for breach of a charter party made at New York October 7, 1890. The breach complained of was a failure to provide facilities for discharging, whereby demurrage was incurred, and certain expenses were entailed. The libel, as amended at the trial, claimed, upon both causes of action, $1,547.70. A decree was entered in favor of the libelants for the extra expense, amounting to $191.64, and as to the claim for demurrage the libel was dismissed.

The vessel brought a cargo of 2,267 tons of coal from Cape Breton to the port of New York. The charter party, among other things, provided that when loaded she should "proceed to New York, * * * and deliver the same, (lying always afloat.) * * * Five working days, Sundays excepted, are allowed the charterers for loading, and discharge as fast as she can deliver in ordinary working hours. * * * Any lighterage at port of discharge to be at charterers' risk and expense. * * * Vessel to discharge at one safe berth in New York harbor as ordered by charterers; any subsequent move to be at charterers' expense. * * * Vessel to work at night when required by charterers; any extra expense thereby incurred to be borne by the charterers." By a further clause the vessel was required "to provide sufficient steam to run all cargo winches at one and the same time." Demurrage was fixed at £40, British sterling, per day.

The vessel sailed from Cape Breton on December 3, 1898. On December 2d the defendants, Perkins & Co., wrote to the libelants' agents, announcing the date of departure, and concluding: "Upon arrival please have the steamer go to Eighteenth street, North river, to discharge her cargo, and report to Thomas Cunningham, the gas company's stevedore, who will discharge her at the customary rate." The vessel arrived December 10th, and reached the designated wharf about 8 A. M. The berth was then occupied by the barge Kingston. The vessel came to the outer end of the pier, and asked for Thomas Cunningham, but he was not there; and learning from persons on the pier that there would be no berth till the following morning, and there being no place to make fast alongside, the captain took her to an anchorage at Weehawken. The captain then went down town, reporting the situation to his agents, and served a notice upon the defendants that his steamer was arrived, and would be ready to discharge at 7 A. M. on December 11th, and that lay days would commence at that time. At what time this notice was served on the defendants does not appear, but it could hardly have been before 11 A. M., and by that hour on December 11th there was a berth ready for her at Eighteenth street, the Kingston having moved away. We concur with the district judge in his opinion upon this branch of the case, holding that, having provided a berth within 24 hours after notice of arrival, the charterers fulfilled their obligations in that regard, and are not to blame for the circumstance that coming to the wharf early in the morning of December 11th, and finding the Kingston still there, the Netherholme returned to anchorage, and did not finally berth till nearly 6 P. M. The lay days, therefore, commenced on December 12th.

Through the nonattendance of the customhouse officer, discharge did not commence during the forenoon of that day, and, owing to incumbrances on the dock, the discharge during the afternoon was further delayed; the consignees not being prepared to receive more than half of what the ship was prepared to deliver from two hatches. On December 13th the respondents availed

themselves of their privilege under the charter party to order the vessel to a second berth, at the pier, foot of Forty-Second street, North river. There was a loss of half a day here, through delay in furnishing the transfer permit. The 14th was Sunday; the 17th, unfit to work by reason of rain, and discharge was completed Saturday, the 20th, at 1:30 P. M. The vessel had four hatches, with winches and proper appliances at each for discharging cargo. Only two were used at Eighteenth street, the obstructions on the pier preventing the respondents from taking even as much as was discharged from them. At Forty-Second street only two hatches could be worked in the regular way, owing to the size and shape of the pier. A third hatch, the forward one, was also made serviceable by the afternoon of the 16th; a platform 60 feet long being erected, over which the coal could be rolled from the hatch to one of the derricks on the pier. No effort was made to discharge from any hatch into lighters. In order to expedite the discharge the respondents worked the ship on the nights of the 18th and 19th. At this season, "ordinary working hours," as regulated by the customhouse officers in this port, closed at sunset, i. e. about 4:30 P. M. As stated above, the discharge was completed at 1:30 P. M. on Saturday, December 20th.

The libelants contend that the ship was not given the dispatch her charter called for, in that respondents failed to provide facilities, either at the wharf or by lighter, to allow her to discharge from all four hatches at once. During the entire time of discharge, all her winches were in good condition. She had steam to work all four of them, as the charter required, and was able to discharge from all, if facilities for the receipt of cargo had been provided. The charter provides that the ship should discharge "as fast as she can deliver in ordinary working hours." This language is perfectly plain and unambiguous. It contemplates a delivery by every ordinary means at her disposal. That she was to run all her cargo winches at one and the same time was also, manifestly, within the contemplation of the parties, for it is expressly stipulated that she shall provide sufficient steam to so run them all. We are therefore of the opinion that she was entitled to insist on discharge as fast as she could from all of them. We do not agree with the district judge that by such a construction there is read into the contract more than its language imports. On the contrary, to qualify the provision by restricting it to one or two or three of her hatches would be to read into the charter a clause which the parties did not insert, and which we have no reason to suppose they intended to insert. In fact the provisions about lighters, and the supplying of steam for all the winches, are persuasive to the conclusion that the parties meant precisely what they said.

The case of The Glenfinlas, 1 C. C. A. 85, 48 Fed. Rep. 758, is referred to as sustaining the contention of the respondents that the ship was entitled to discharge from two hatches only. In that case the provision of the charter party was, as in this case, that the vessel should "be discharged as fast as she can deliver." It

was held that evidence of a practice of the port, as respects the delivery of cargoes of chalk, (with which the Glenfinlas was loaded,) "could not control the plain intent of the charter to provide for a rapid discharge during working hours." In the opinion in that case it was stated that "vessels of her size use at least two hatches, and under the charter the Glenfinlas was entitled to do so, despite the evidence of a contrary practice, having reference to smaller vessels, and smaller cargoes." But in that case, although the Glenfinlas had four hatches, her owners made no claim to work more than two, and for aught that appeared in the case she was not equipped to work more than that number. Deciding only the precise point raised in that case, we held that if the ship was prepared to work two hatches, and claimed the right to do so, she was entitled to discharge therefrom, under such a charter party, during ordinary working hours, and on ordinary working days, despite any custom. In the case at bar, where the ship was equipped with proper winches and steam, and ready to work four hatches, we hold, in like manner, that she was entitled to discharge therefrom, such discharge being in strict conformity to the agreement of the parties, as expressed in the charter party. We are satisfied from the evidence that the ship demanded more rapid discharge than she received, and was entitled to demurrage for any detention subsequent to the lay days necessary to effect her discharge from four hatches.

As to her rate of discharge from four hatches the testimony is somewhat contradictory. The master and another witness put it at 200 tons per hatch, but they were evidently estimating on a day of 10 hours, and the ordinary hours at that season, in this port, are only 8½. It appears that on December 15th the ship discharged all day from two hatches,—Nos. 2 and 3. We do not find that there was any particular obstruction or delay incident to this discharge, and she landed 235 tons. This would make the rate from four hatches 470 tons per day, and it would require five days to complete the discharge of the 2,267 tons. The lay days began on December 12th. Therefore, had she been given such discharge as she was entitled to, they would have covered December 12th, December 13th, (Saturday,) December 15th, December 16th, and December 18th, (December 17th being unfit to work, by reason of rain,) and the ship is entitled to two days' demurrage, viz. December 19th and 20th. We concur with the district judge as to respondents' liability for the extra expense caused by working the ship at night, and for the towage.

Decree of district court reversed, and cause remanded, with instructions to decree in accordance with the views expressed in this opinion; costs of both courts to libelants.