BALCARRES BROOK S. S. CO., Limited, v. GRACE et al.

(Circuit Court of Appeals, Second Circuit. July 29, 1896.)

1. CHARTER PARTY—GUARANTY OF SHIP'S CAPACITY.

A charter for a voyage to certain West Coast South American ports, by which the charterers agreed to pay a lump sum of £4,500 sterling, contained a guaranty that "steamer will carry under deck at least 3,000 measurement tons of 40 cubic feet," a concession of 30 shillings to be made for each ton of shortage. The charter was signed by the New York agents of the ship, who had informed the owner in England that 30 shillings per ton freight would be paid, or £4,500, "provided owners will guaranty 3,000 tons cargo," and had received an answer: "Close according to your telegram, £4,500 sterling. Owners guaranty 3,000 tons measurement, 40 cubic feet." Held, that the guaranty was of a vessel in which the charterers could ship 3,000 measurement tons of ordinary West Coast South American cargo. 66 Fed. 358, reversed.

2. AUTHORITY OF MASTER.

The master has no authority to release a charterer from paying the hire reserved to a shipowner in a charter party, or to vary the terms of the contract made by the owner.

Appeal from the District Court of the United States for the Southern District of New York.

William L. Turner, for appellants.

Convers & Kirlin, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The appellants have appealed from a decree (66 Fed. 358) adjudging them to be liable for an unpaid balance of charter hire accruing under a charter party made between them and the appellee. By the instrument, the appellee chartered the whole of its steamship to the appellants for a voyage from the port of New York to certain West Coast South American ports, and engaged to take and receive on board the vessel "all such lawful goods and merchandise" as the charterers "might think proper to ship"; and the appellants engaged to pay for the hire of the vessel a lump sum of £4,500 sterling. The instrument contained the following clause: "Owners guaranty that steamer will carry under deck at least 3,000 measurement tons of 40 cubic feet, failing which cargo capacity charterers shall be allowed a concession of 30 shillings sterling for each and every ton short carried of said stipulated minimum capacity." The charter party was signed in New York City, May 26, 1892; the steamship then being at sea. The appellants were a well-known mercantile firm in that city, engaged in the West Coast South American trade. In the negotiations, the appellee was represented by Livermore & Co., the ship's agents at New York City. On the day previous to the signing of the charter party, Livermore & Co. informed the London agents of the owners that a charter for the steamship could be closed with the appellants, conditioned that they would load her with a full and complete cargo, and pay 30 shillings per ton freight, or would pay £4,500 sterling, "provided owners will guaranty 3,000 tons cargo." The London agents thereupon cabled Livermore & Co. as follows: "Close according to your telegram, £4,500 sterling. Owners guaranty 3,000 tons measurement, 40 cubic feet." Pursuant to this cablegram, Livermore & Co. signed the charter. The vessel was delivered to the appellants August 26, 1892. They put on board a cargo of 2,393 measurement tons, and this cargo seems to have occupied the whole available space in the vessel. No question was made by the master or by Livermore & Co. that it was not properly stowed, or was not ordinary West Coast South American cargo, such as the appellants were entitled to ship under the charter party. The master and Livermore & Co., assuming that the cargo was properly stowed, and that it was the meaning of the charter party that the appellants should have their cargo carried for 30 shillings per ton, settled the freight with the appellants upon the basis of 2,393 tons at that rate. The appellee disavowed this settlement, and brought the present action to recover the balance of the £4,500, upon the theory that the space under the steamship's deck available for the stowage of cargo was more than 120,000 cubic feet. Upon proofs showing that the steamship, in the condition in which she was tendered to the appellants, had a "maximum free cubic space within the cargo limits" under deck, available for their use, of 122,936 cubic feet, the district court held the appellee was entitled to the charter hire of £4,500, and that the settlement made was unauthorized and nugatory.

Although the master of a ship has authority in a foreign port to settle accounts for freight, demurrage, and delay, and similar items, he has none to release a charterer from paying the hire reserved to a shipowner in a charter party, or to vary the terms of the contract made by the owner. Neither the master nor the ship's agent could make a deduction from the charter hire based on an unwarranted interpretation of the charter party; and, if the deduction claimed by the appellants was thus erroneously allowed, the appellee was entitled to recover the unpaid balance. The question to be determined is whether the deduction was authorized by the terms of the contract; in other words, whether, according to the proper construction of the concession clause, the guaranty was of the ship's cargo space, or of her capacity to carry such a cargo as it was contemplated she would be loaded with for the particular voyage.

It appears by the proofs that there is a wide margin of variation in the compactness of stowage of different kinds of measurement cargoes, and that the space lost in stowage ranges from 7 to 20 per cent. of the whole cargo space of the vessel. Consequently, a guaranty of a ship's cargo space, and of her capacity to carry measurement cargo, or a particular kind of cargo, are very different things.

The clause is loosely expressed, but, read in the light of the extrinsic circumstances bearing upon its interpretation, we conclude that it was intended to guaranty the charterers a vessel in which they could ship, if they chose, 3,000 measurement tons of ordinary West Coast South American cargo.

That the parties contemplated that the vessel was to be employed to transport that kind of cargo, notwithstanding the contract did not specify any particular kind, is apparent, not only from the circumstance that the charterers' business consisted in shipping such cargoes, but also because cargoes shipped at the port of New York to the ports named in the charter party or other West Coast South American ports have a definite character. The characteristics of those cargoes are so well understood in shipping circles that it is usual to estimate the variation between the cargo space of vessels and their capacity for carrying these cargoes at 12 per cent., the difference being lost in stowage.

The guaranty is to be construed as intended to provide the charterers with a vessel capable of carrying the specified quantity of cargo of the kind they proposed to ship. In Mackill v. Wright, 14 App. Cas. 106, the shipowners guarantied that the vessel should "carry not less than 2,000 tons deadweight of cargo." All the judges agreed that the guaranty should be read as something more than one merely of the carrying capacity of the ship, and that it was to be construed as guarantying her capacity with reference to the voyage, and the description of cargo proposed to be shipped, so far as that description was made known to the owners. See Carv. Carr. by Sea, 141.

The proposition submitted by Livermore & Co. to the vessel's London agents denotes clearly the intention of the charterers to

have a contract by which their freight on the cargo they were to ship should be 30 shillings per ton. Presumably because neither the appellants nor Livermore & Co. knew definitely the cargo capacity of the vessel, but supposed it to be about 3,000 tons, the proposition was in the alternative, to load her with a full cargo, and pay 30 shillings per ton freight, or pay £4,500 lump freight, with a guaranty that she would carry 3,000 tons of cargo. If she would carry more than 3,000 tons, the first was the better offer; if she would not, the lump sum and guaranty was an equivalent offer. There was no room to misunderstand the purport of the terms proposed; and, if the offer of the lump sum had been understood by Livermore & Co. to be a better one than the other, they would not have troubled themselves to communicate the other to the London agents. The instruction of the London agents to Livermore & Co. to close for the lump freight did not suggest any qualification of the offer; but for greater certainty, and probably to exclude any misconception that the cargo capacity was to be of tons weight, they specified that it was to be "tons measurement, 40 cubic feet." What they meant by this, and what Livermore & Co. understood by it, is manifest by the phrase as written in the charter party, "Steamer will carry under deck at least 3,000 measurement tons of 40 cubic feet." It would defeat the plain intention of the parties to close a charter on the basis of 30 shillings per ton for the cargo the appellants were to ship, as evidenced by the proposition and acceptance, to treat the guaranty clause as meaning that they should pay the lump sum in case they were furnished with a vessel having 120,000 cubic feet of space within her cargo limits.

The conclusion that the guaranty was intended to provide the appellants with a ship of a carrying capacity to enable them to load upon her 3,000 tons of ordinary West Coast South American cargo is enforced by the construction placed upon it by the conduct of Livermore & Co. before controversy arose. Obviously, Livermore & Co. understood the clause to mean just what the appellants supposed it to mean, viz. that, in the event that the vessel should not have a cargo capacity for carrying 3,000 measurement tons of the kind of cargo usually shipped from New York for the ports named, they should have a concession of 30 shillings per ton for the amount short-carried, and thus pay a charter hire of 30 shillings per ton for that actually carried, or which could be laden on board.

Our attention has been called to several adjudged cases bearing upon the question of the construction of warranties of the carrying capacity of vessels in charter parties. None of them are so analogous to the present as to be of any value as an authority in point. Each case was controlled by the particular facts indicative of the intention of the clause.

Although the master of the steamship seems to have been satisfied that the cargo loaded by the appellants was the usual West Coast South American cargo, and that no space was unnecessarily lost in stowage, the discrepancy between the amount loaded and the amount which can ordinarily be loaded in a vessel having the cargo space of the steamship is so wide that we are constrained to be-

lieve that there was an erroneous estimate of the amount actually laden on board, or that the cargo was not as advantageously stowed as it could and should have been. As has been stated, there should have been a loss of but 12 per cent. of the cargo space in stowage. The proofs show quite satisfactorily that, allowing for this loss, the cargo capacity of the steamship for the stowage and carriage of ordinary West Coast South American cargo was certainly 2,760 tons. How the mistake occurred is wholly a matter of conjecture. The proofs as to the accuracy of the estimate of the amount laden on board are meager and unsatisfactory.

We conclude that to the extent of 367 tons the concession was erroneously allowed, and that there should be a decree for the libelants upon that basis, with interest.

The decree is accordingly reversed, with costs of this court to the appellants, with instructions to the district court to decree for the libelants, with costs of that court, and conformably with this opinion.