### McCALDIN et al. v. CARGO OF SCRAP IRON.

(District Court, S. D. New York. October 26, 1901.)

**1. SHIPPING—DEMURRAGE—EXTRA EXPENSE OF LOADING AND DISCHARGING.**

A steamer was chartered to carry a cargo of iron shot, "consisting of pieces averaging in weight about 100 pounds"; the cargo to be "received and delivered alongside of the vessel, where she can load and discharge always safely afloat, within reach of her tackles; and lighterage, if any, to be at the risk and expense of the cargo." It was also provided that

the cargo should be furnished as fast as she could load the same, and that in discharging it should be received as fast as she could deliver it. The cargo furnished consisted of miscellaneous scrap iron; the pieces varying from small shot to cannon balls weighing 250 to 300 pounds, and broken beams and gun carriages weighing up to 1,600 pounds. She was unable to lie safely at the wharf where she was required to load, because of insufficient depth of water, and a considerable delay occurred in obtaining lighters. Delay was also caused in both loading and discharging by reason of the variation in the character of the cargo from that specified in the charter. *Held*, that her owners were entitled to demurrage at the charter rate for all delay so caused.[1]

2. SAME.

A steamer 310 feet long, and having three hatches, entitled under her charter to be furnished with cargo as fast as she can load the same, and where she can safely lie afloat, which is required to load at a wharf having a frontage of 40 feet, only a part of which has a depth of water sufficient to float her while loading, cannot be required to submit to the danger and inconvenience of breasting out at such wharf in order to load without the aid of lighters.

In Admiralty. Action against charterer to recover for demurrage and extra expense in loading and discharging.

James J. Macklin, for libelants.

Wing, Putnam & Burlingham, for claimant.

ADAMS, District Judge. This is an action brought to recover demurrage and extra expense of the steamer Lassell, incurred by her in receiving and discharging cargo, under a charter party made between the libelants, as owners, and the Columbia Smelting & Refining Works, dated, "New York, February 19, 1901:" The charter provided that a cargo should be furnished to the steamer of at least 1,200 tons of iron shot, consisting of pieces averaging in weight about 100 pounds, to be loaded at a dock at Ft. Morgan, Mobile, Ala., and discharged at a wharf in New York, as ordered by the charterer, or so near thereunto as she could proceed and always float with safety. "The cargo or cargoes to be received and delivered alongside of the vessel, where she can load and discharge always safely afloat, within reach of her tackles; and lighterage, if any, to be at the risk and expense of the cargo." It was further provided that the cargo should be furnished the steamer as fast as she could load the same, and, in discharging, that it should be received as fast as the steamer could deliver it. A rate of demurrage of $175 per day was agreed upon. The steamer proceeded to Pensacola, Fla., where she took aboard a stevedore with 15 men for the purpose of loading, and thence to Ft. Morgan on the 16th day of March, 1901. She arrived there on the same day, and reported to an agent of the claimant, who pointed out a wharf at which the vessel was to load. She hauled there the next day (Sunday) at 5 o'clock in the morning. The loading was commenced the 18th, but was discontinued the 19th, because the vessel struck the bottom; and she was obliged, for safety, to haul out in the stream, where she was loaded, after considerable detention, by means of lighters. The cargo furnished was not in accordance with the provisions of the charter party, but

[1] Definitions and general principles of demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

consisted of a variety of scrap iron, in pieces varying from small shot, grape or canister, weighing a few pounds, to large cannon balls, weighing 250 or 300 pounds, and broken beams, cannon, and gun carriages, weighing up to 1,500 or 1,600 pounds. This variation in the character of the cargo caused the vessel much greater expense in loading than if it had been furnished as agreed upon. When the steamer reached New York, there was further delay in providing her with a wharf at which she could discharge, and additional expense incident to the kind of cargo she had been furnished with.

It is urged in defense that the provision of the charter concerning the character of the cargo was not a warranty, but a mere promise, which could be and was waived by the master of the vessel receiving it without protest. The master, however, in signing the bill of lading, indorsed it, "Signed under protest for settlement of dead freight and demurrage." If a protest were necessary, this language would seem broad enough to protect the owners of the vessel. In any event, I am satisfied that there was no waiver on the master's part, even if he had authority to relieve the charterer from its contract with the libelants, which is doubtful. Gracie v. Palmer, 8 Wheat. 604, 639, 5 L. Ed. 696; Steamship Co. v. Grace, 22 C. C. A. 7, 75 Fed. 1017, 1019.

It is further urged that as the libelants, before signing the charter party, made inquiries concerning the draught of water at Ft. Morgan, and found, as they thought, that there was sufficient water for her to lie safely at the wharf, they should not now be permitted to rely upon the terms of the charter party, in the absence of a warranty as to the depth of water, but assumed the risk of being able to lie safely and load at the wharf. The facts seem to be that the brokers who were negotiating the contract between the parties telegraphed to the charterer's agent at Ft. Morgan, asking if steamer could load to "eighteen-foot draught," and received a favorable reply, after which the owners executed the contract. The information was correct as to there being such a depth of water at a part of the wharf, but it was not a fact that a vessel of such a draught could lie there safely, or load there with dispatch. The steamer was 310 feet long, and the wharf had an available face or end of about 40 feet, at a part of which, only, was there a sufficient depth of water. Moreover, the steamer had three hatches, which she was entitled to use under the stipulation for the receipt of cargo as fast as she could load (Hine v. Perkins, 5 C. C. A. 377, 55 Fed. 996), and could only use one at this wharf. The terms of the contract were not complied with by the charterer when it furnished such a wharf, even if its contention could be otherwise sustained. Burdge v. 220 Tons of Fish Scrap (D. C.) 2 Fed. 783; Belmont v. Tyson, 3 Fed. Cas. 150.

It is further contended that the steamer should have breasted out, so that she could have been loaded in that way, but I do not think she was required to submit to such danger and inconvenience. The Glenfinlas, 1 C. C. A. 85, 48 Fed. 758.

My conclusion is that the libelants are entitled to recover for detention at Ft. Morgan and New York; also for the extra expense

of loading and discharging caused by the difficulty of handling the cargo provided. But as the evidence before me does not satisfactorily establish the amounts recoverable, particularly with reference to the time lost at Ft. Morgan, there must be a reference to determine them.

Decree for the libelants, with an order of reference.